[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 02, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-15109
Non-Argument Calendar

_____

D. C. Docket No. 05-01791-CV-RDP

MARTHA GREEN,

Plaintiff-Appellant,

versus

SOCIAL SECURITY ADMINISTRATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(May 2, 2007)**

Before ANDERSON, BIRCH and BARKETT, Circuit Judges.

PER CURIAM:

Pursuant to 42 U.S.C. § 405(g) Martha Green appeals the district court's

order affirming the decision by the administrative law judge ("ALJ") denying her application for Social Security disability insurance benefits. On appeal, Green alleges that the ALJ erred by: (1) misapplying the three-part pain standard in assessing Green's condition; (2) discrediting the opinion of Green's treating physician; and (3) concluding that Green had the residual functional capacity ("RFC") to perform a significant number of jobs at the light exertional level. Upon review of the record, we AFFIRM the denial of benefits.

## I. BACKGROUND

Green filed an application for a period of disability and disability insurance benefits alleging a disability onset date of 5 January 2001. She listed chronic obstructive pulmonary disease ("COPD"), tendonitis, back problems, anxiety, and depression as conditions forcing her to discontinue work. Green indicated that at a job she held until January 2001, she sat 7 hours a day in an 8-hour workday, stood or walked for a total of 1 hour per day, lifted a maximum of 20 pounds, and frequently lifted 10 pounds. The Commissioner denied Green's application both initially and on reconsideration. Green requested, and was granted, a hearing before an ALJ.

Dr. David Bryant examined Green in August 1991, regarding pain in her right forearm to the elbow area that had been bothering her for seven months.

Green had a slight increased pain upon performing a deep grip. Dr. Bryant noted that X-rays showed no obvious abnormality and diagnosed her with lateral epicondylitis. He prescribed Naprosyn and instructed her to apply ice and to exercise.

Dr. Bryant saw Green again in May 1997, due to complaints of pain in her arms. He diagnosed her with bilateral tendinitis of the upper extremities and advised her to continue with physical therapy and wrist splints. Green also visited Dr. Bryant in May 2000, complaining of pain in both arms for two weeks and a burning sensation in her left hip for a year. He diagnosed the arm pain as tendinitis and the hip pain as possible osteoarthritis. A nerve conduction test performed that month revealed a normal study in the bilateral upper extremities and no evidence of muscle atrophy, sensory loss, entrapment neuropathy, or peripheral neuropathy.

Green was hospitalized by Dr. Bryant in January 2001, with complaints of increased shortness of breath, cough, congestion, and inability to breath. She was treated with intravenous bronchodilators, antibiotics, and nebulizer treatments along with oxygen. She was diagnosed with COPD exacerbation, emphysema, bronchitis, hypoxia, hypertension, tobacco abuse, and alcohol abuse.

Dr. Bryant conducted pulmonary function testing in February 2001. He discovered a mild obstructive lung defect and confirmed airway obstruction by the

decrease in flow rates. He determined that her lung volumes were within normal limits.

Green met with Dr. Walter Ross in March 2001, and Dr. Ross noted that Green had been on oxygen and blood pressure medication, and observed reduced breath sounds. In April 2001, Dr. Ross noted that Green was "doing quite well not smoking" and had no significant cough or sputum production. R2-5 at 121. He concluded that her chest was clear and her COPD had improved. He instructed her to discontinue oxygen treatments and stop the nebulizer in two weeks, restarting if needed. Dr. Ross noted that Green was "feeling quite well" when she visited in May 2001 as well. Id. He noticed no significant cough or sputum production and that her chest was entirely clear with only slightly diminished breath sounds. He indicated that she was only using her nebulizer once in a while, and was able to discontinue oxygen treatment, except for when she occasionally gets tired.

Green saw Dr. Ross again in August 2001, and he indicated that she was doing well and not smoking, but still fatigued fairly easily, did not walk, and was not working. He noticed clear, but reduced breath sounds. Consultative pulmonary function testing was performed in October 2001, and it revealed moderate obstructive airway disease and low flow rate. Green "gave [a] good effort" in completing the test but experienced dizziness, shortness of breath,

4

coughing, and wheezing.  Id. at 122.  There were no signs of improvement noted on the bronchodilator use.

In October 2001, Dr. Bryant noted osteoarthritis regarding pain in Green's right middle finger.  She also saw him in December 2001, complaining of aches in her knees, hands, and back.  Dr. Bryant diagnosed her with COPD, tendinitis in her forearms, hypertension, and osteoarthritis at multiple sites, and instructed her to continue over-the-counter pain relief.  During that office visit, Dr. Bryant completed a Physical Capacities Evaluation, a Clinical Assessment of Pain, and a Clinical Assessment of Fatigue/Weakness.  Dr. Bryant concluded that Green could lift five pounds or less occasionally, sit for two hours, and walk or stand for two hours during each eight hour workday.  He determined that she could not work around hazardous machinery or dust, allergens, or fumes.  Dr. Bryant concluded that "[p]ain is present to such an extent as to be distracting to adequate performance of daily activities or work," and that physical activity would lead to "[g]reatly increased pain and to such a degree as to cause distraction from tasks or total abandonment of tasks."  Id. at 145.  He stated that Green suffered from fatigue/weakness that he "found to be virtually incapacitating" to her, and that physical activity would greatly increase the fatigue/weakness "to such a degree as to cause total abandonment of tasks."  Id. at 147 .

5

Dr. Ross examined Green in January 2002, and noted that she was "doing quite well," and had "minimal cough, minimal sputum production, [and] minimal shortness of breath." Id. at 150 . He diagnosed her as having mild COPD. In July 2002, Dr. Ross noted that Green, again, was "doing quite well," with no significant cough or sputum production. Id. He indicated that she was sleeping with oxygen at night and her hypertension was controlled with medication.

During Green's administrative hearing in September 2002, Norma-Jill Jacobson, a vocational expert (VE), testified that Green's employment history as a sewing machine operator was "at the light level of exertion," and her experience was "unskilled or very low end of semiskilled with no transferability." Id. at 174. The ALJ asked Jacobson for her opinion regarding:

> a hypothetical person of Ms. Green's age, education and work experience. And let's assume that this hypothetical person could occasionally lift and carry 20 pounds, could frequently lift and carry 10 pounds, could stand and walk for up to six hours in an eight-hour day and sit for up to six hours in moderate pain and fatigue with a moderate [e]ffect on the person's ability to concentrate. And this hypothetical person needs a work environment that is free of dust, fumes and gases, and has a temperature and humidity control atmosphere.

Id. Jacobson responded that such a hypothetical person would be unable to return to any of the past work that Green performed, because of cotton fabric dust present in the air in those environments. Jacobson stated that a person with those

6

hypothetical conditions could work in the local or national economy as a daycare helper, kindergarten aide, or teacher assistant, of which there are about 2000 positions in Alabama. Additional sedentary jobs included: taking orders or soliciting as a telephone operator (2000 positions); information clerk, both at a light and a sedentary level of exertion (a couple thousand positions in combination); a cashier, both at a light and a sedentary levels of exertion (15,000 to 20,000 positions); and other possibilities inside Alabama and elsewhere. Jacobson stated that any possibility of employment would be eliminated if that hypothetical person were to experience fatigue to the extent that the person could only stand and walk for two hours and sit for two hours during every eight hour shift.

At her hearing, Green testified that she is an unemployed 49-year old woman with an eighth grade education, who had not passed the GED test or taken any vocational training. To treat her COPD, she testified that she uses an oxygen tank while sleeping at night and during infrequent trips outside when the temperature was hot. She testified that twice a week, at the direction of her doctor, she attempts to walk two laps at the track for exercise but can only complete one lap before she needs to retreat to her car for her oxygen. She noted that she suffers shortness of breath about halfway around the track. She indicated that housework is difficult for her, but possible if she works slowly. She stated that she has trouble sitting for

long periods because of lower back pain.

The ALJ noticed that Green had braces on both arms from her fingers to her elbows and she responded that she wore them constantly for tendinitis, which she testified that she began to suffer from in 1990. She explained that she takes Bufferin for the pain, but it was the tendinitis that forced her to quit her job as a sewer in 1994. She stated that she can only lift about five pounds and needs both hands to pick up a gallon of milk. She asserted that she can grip a small paper cup with one hand, but is unable to open a jar.

The ALJ determined that Green was not disabled after concluding that Green was unable to return to her former employment, but was "able to make an adjustment to other work which exists in significant numbers in the national economy." Id. at 16. The ALJ found that Green last engaged in substantial gainful activity on 5 January 2001. The ALJ found that her COPD and hypertension amounted to severe impairments, but that her tendinitis and osteoarthritis were considered to be non-severe impairments because they "do not significantly limit her ability to perform basic work-related functions" and "are intermittent." Id. The ALJ also found no limitations of function resulting from any alleged anxiety or depression. The ALJ determined that Green did not have "an impairment or combination of impairments which, either singly or in combination, meet or equal

8

a listed impairment" in 20 C.F.R § 404.1520(d). Id. at 20.

The ALJ then examined Green's RFC by considering her subjective complaints and our standard for reviewing subjective complaints of pain. The ALJ found that "[a]lthough the documentary evidence establishes an underlying medical condition capable of producing some pain and limitation, substantial evidence does not support a conclusion that the objectively determined medical condition is of such severity that it could reasonably be expected to give rise to the level of pain and limitations alleged by [Green]." Id. The ALJ determined that Green "experiences no more than moderate limitations resulting from her [COPD]," and that "[h]er testimony [was] found credibly only to the extent that it [was] consistent with" limitations of "moderate fatigue with its moderate effect of her ability to maintain concentration, persistence, and pace." Id. at 21. With regard to Green's tendinitis and osteoarthritis, the ALJ found that the medical evidence "simply do[es] not support the limitations imposed" by the Physical Capacities Evaluation, Clinical Assessment of Pain, and Clinic Assessment of Fatigue/Weakness completed by Dr. Bryant, and therefore, the ALJ afforded "no weight . . . [to] Dr. Ross's opinion of the claimant's limitations." Id. Based on the entire record, the ALJ determined "that [Green] is limited to occasionally lifting and carrying twenty pounds, frequently lifting and carrying ten pounds;" that, "in

9

an eight-hour workday, she can stand and/or walk six hours and sit six hours;" and that "[s]he experiences moderate fatigue with its moderate effect on her ability to concentrate, and requires a temperature and humidity controlled environment, free of dust, fumes, and gasses." Id.

Consistent with the testimony of the VE, the ALJ found that Green was unable to perform her past relevant work as a sewing machine operator because of the prevalence of cotton dust in that environment. The ALJ determined, however, that "considering [Green's] age, educational background, prior work experience, and [RFC], [she] is capable of performing work which exists in significant numbers in the national economy." Id. at 22. Accordingly, the ALJ ruled that Green was "not disabled." Id.

The Appeals Council denied Green's request for review. The district court affirmed the Commissioner's decision. This appeal followed.

## II. STANDARD OF REVIEW

We review the Commissioner's decision in a Social Security case "to determine if it is supported by substantial evidence and based on proper legal standards." Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam) (citation and internal quotations omitted). We have defined substantial evidence as "more than a scintilla" and as "such relevant evidence as a

reasonable person would accept as adequate to support a conclusion." Id. (citation and internal quotations omitted). The legal conclusions employed by the Commissioner are reviewed de novo. Lewis v. Barnhart, 285 F.3d 1329, 1330 (11th Cir. 2002) (per curiam).

## III. DISCUSSION

A. Pain Standard

Green argues that had the ALJ properly considered the medical evidence in the record, he would have found her disabled based on her complaints of pain. "An individual claiming Social Security disability benefits must prove that she is disabled." Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam) (citation omitted). We have held that "[i]n order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam) (citation omitted). We have applied that standard to complaints of subjective conditions other than pain. Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam) (citation omitted). An ALJ that

11

discredits subjective testimony "must articulate explicit and adequate reasons for doing so," and "failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true." Wilson, 284 F.3d at 1225 (citations omitted).

We find that substantial evidence supports the ALJ's conclusion, which he bolstered with articulated explicit and adequate reasons, that the objectively determined medical condition does not "give rise to the level of pain and limitations alleged by [Green]." R2-5 at 20. Green was initially hospitalized, and rendered unable to work, in early January 2001, for breathing complications resulting from COPD. The accompanying documentary evidence, however, indicates that her condition had steadily improved. At an examination in April 2001, after she had quit smoking, Dr. Ross, the physician treating her lung condition, instructed Green to discontinue oxygen treatments because she was "doing quite well" and had no significant cough or sputum production. Id. at 121. Similar positive comments appear on Dr. Ross's charts throughout the course of his examinations, including his last and most recent contained in the record, from July of 2002. With regard to her osteoarthritis and tendinitis, Dr. Bryant, her primary care physician, treated Green on 4 December 2001, and chose not to prescribe narcotics; instead, he instructed her to continue using over-the-counter

12

pain medication. The ALJ properly found that Green had no more than moderate limitations from COPD/emphysema and had moderate fatigue. We find that substantial evidence supports the ALJ's finding that Green's subjective complaints do not rise to the level of a disability, based on the controlling pain standard.

B. Green's Treating Physician

Green argues that the ALJ erred by dismissing Dr. Bryan's opinion that her disabilities prevented her from working, as expressed in the Physical Capacities Evaluation, Clinical Assessment of Pain, and Clinical Assessment of Fatigue/Weakness. We have noted that "[i]t is well-established that the testimony of a treating physician must be given substantial or considerable weight unless good cause is shown to the contrary." Crawford, 363 F.3d at 1159 (citation and internal quotations omitted). Good cause to discount a treating physician may arise where a report "is not accompanied by objective medical evidence or is wholly conclusory." Id. (citation and internal quotations omitted). The ALJ may also devalue the opinion of a treating physician where the opinion is contradicted by objective medical evidence. Ellison v. Barnhart, 355 F.3d 1272, 1275-76 (11th Cir. 2003) (per curiam) (citation omitted).

Here, the ALJ had good cause to discredit Dr. Bryant's opinion. See Crawford, 363 F.3d at 1159. The ALJ afforded no weight to Dr. Bryant's opinion–

13

as expressed in the Physical Capacities Evaluation, Clinical Assessment of Pain, and Clinical Assessment of Fatigue/Weakness–that Green suffered from distracting pain and virtually incapacitating fatigue and weakness that could lead to abandonment of tasks.[1]  The office records of Dr. Ross indicate that Green was "[d]oing quite well" with her respiratory problem shortly after Dr. Bryant completed the forms in December 2001.  R2-5 at 150; see also id. at 121 (noting in other office visits that Green was "[f]eeling quite well" and "[d]oing well").  Dr. Bryant's treatment notes indicate that on the same day he completed the forms, he examined her and did not prescribe any narcotics for her pain related to her tendinitis; rather he instructed her to continue the use of over-the-counter medication.  Moreover, Green testified that the use of over-the-counter medication "eases [the pain] off."  Id. at 170.  Dr. Ross's office records and Green's testimony amount to substantial evidence supporting the ALJ's decision to devalue the opinion of Dr. Bryant.  See Wilson, 284 F.3d at 1226 (finding the decision to discredit subjective pain testimony was supported by evidence that testimony was inconsistent with claimant's condition, activities, and limited use of pain medication).

---

[1] Although the ALJ states that "no weight is afforded to Dr. Ross's opinion of the claimant's limitations," R2-5 at 21, it appears clear from the context, and Green concedes, that the ALJ was actually referring to Dr. Bryant.

C.  Residual Functional Capacity

Green argues that without Dr. Bryant's opinion, there is nothing in the record for the ALJ to base his RFC conclusion that she can perform light work.  As mentioned previously, the burden lies with the claimant to prove her disability.  Moore, 405 F.3d at 1211.  In the fourth step of that analysis, the ALJ determines the claimant's RFC and her ability to return to her past relevant work.  Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004).  In determining the claimant's RFC, the ALJ "must determine if the claimant is limited to a particular work level."  Id.  The light work level requires the ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and "a good deal of walking or standing, or when it involves sitting most of the time[,] . . . some pushing and pulling of arm or leg controls."  20 C.F.R § 404.1567(b).  Although a claimant may provide a statement containing a physician's opinion of her remaining capabilities, the ALJ will evaluate such a statement in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ.  20 C.F.R §§ 404.1513, 404.1527, 404.1545.

If a claimant proves that she is unable to perform her past relevant work, in the fifth step, "the burden shifts to the Commissioner to determine if there is other work available in significant numbers in the national economy that the claimant is

able to perform." Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999) (citation omitted). The "preferred method" for the Commissioner to demonstrate, by substantial evidence, that the claimant can perform other jobs is through the testimony of a vocational expert ("VE"). Id. at 1229. Should the Commissioner "demonstrate that there are jobs the claimant can perform, the claimant must prove she is unable to perform those jobs in order to be found disabled." Id. at 1228.

Green argues that once the ALJ decided to discredit Dr. Bryant's evaluation, the record lacked substantial evidence to support a finding that she could perform light work. Dr. Bryant's evaluation, however, was the only evidence that Green produced, other than her own testimony, that refuted the conclusion that she could perform light work. Once the ALJ determined that no weight could be placed on Dr. Bryant's opinion of the Green's limitations, the only documentary evidence that remained was the office visit records from Dr. Bryant and Dr. Ross that indicated that she was managing her respiration problems well, that she had controlled her hypertension, and that her pain could be treated with over-the-counter medication. Thus, substantial evidence supports the ALJ's determination that Green could perform light work. The ALJ did not substitute his judgment for that of Dr. Bryant; rather, he determined that Dr. Bryant's opinion was inconsistent with objective medical evidence in the record.

After the ALJ concluded that Green could not perform her past work as a sewing machine operator, due to the prevalence of cotton dust in sewing factories, the burden then shifted to the Commissioner to prove that Green could perform some work in the national economy. The VE affirmed that "a hypothetical person of Ms. Green's age, education and work experience . . . [who] could occasionally lift and carry 20 pounds, could frequently lift and carry 10 pounds, could stand and walk for up to six hours in an eight-hour day and sit for up to six hours in moderate pain and fatigue with a moderate affect on the person's ability to concentrate . . . [in] a work environment that is free of dust, fumes and gases, and has a temperature and humidity control atmosphere," could work as a daycare helper, kindergarten aide, teacher assistant, telephone operator, information clerk, or cashier. R2-5 at 174-75. According to the VE, the local economy contained sufficient numbers of such positions. Green did not present any evidence controverting the VE. Thus, substantial evidence supports the ALJ's conclusion that Green could perform jobs in the local economy and, therefore, was not disabled.

## IV. CONCLUSION

Substantial evidence supports the decision of the ALJ to deny Green Social Security disability benefits. The ALJ employed the controlling standard regarding

17

Green's allegations of pain and other subjective conditions; justifiably discredited the opinion of Green's primary care physician in favor of objective evidence; and appropriately concluded that Green could perform work at the light exertional level. Accordingly, we **AFFIRM.**